IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

A.M.,[1]

        Plaintiff,

v.                                                                                          Case No. 19-1085-JWB

ANDREW M. SAUL,
*Commissioner of Social Security,*

        Defendant.

**MEMORANDUM AND ORDER**

Plaintiff filed this action for review of a final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits and supplemental security income. The matter is fully briefed by the parties and the court is prepared to rule. (Docs. 13, 16, 17.) The Commissioner's decision is AFFIRMED for the reasons set forth herein.

**I. Standard of Review**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The Commissioner's decision will be reviewed to determine only whether the decision was supported by substantial evidence and whether the Commissioner applied the correct legal standards. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence as a reasonable mind might accept to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

---

[1] Plaintiff's initials are used to protect privacy interests.

Although the court is not to reweigh the evidence, the findings of the Commissioner will not be mechanically accepted. Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992). The court should examine the record as a whole, including whatever fairly detracts from the weight of the Commissioner's decision and, on that basis, determine if the substantiality of the evidence test has been met. *Glenn*, 21 F.3d at 984.

The Commissioner has established a five-step sequential evaluation process to determine disability. 20 C.F.R. § 404.1520; *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010). If at any step a finding of disability or non-disability can be made, the Commissioner will not review the claim further. At step one, the agency will find non-disability unless the claimant can show that he or she is not working at a "substantial gainful activity." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). At step two, the agency will find non-disability unless the claimant shows that he or she has a severe impairment. At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled. *Id*. at 750-51. If the claimant's impairment does not meet or equal a listed impairment, the agency determines the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). The RFC assessment is used to evaluate the claim at both step four and step five. 20 C.F.R. § 404.1520(a)(4); § 404.1520(f), (g). At step four, the agency must determine whether the claimant can perform previous work. If a claimant shows that he cannot perform the previous work, the fifth and final step requires the agency to consider vocational factors (the claimant's age, education, and past work experience) and to determine whether the

claimant is capable of performing other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 124 S. Ct. 376, 379-380 (2003).

The claimant bears the burden of proof through step four of the analysis. *Blea v. Barnhart*, 466 F.3d 903, 907 (10th Cir. 2006). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy. *Id.*; *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The Commissioner meets this burden if the decision is supported by substantial evidence. *Thompson*, 987 F.2d at 1487.

**II. Background and Procedural History**

Plaintiff applied for disability insurance benefits on October 29, 2009, and supplemental security income benefits on November 17, 2009. (Tr. at 154-163.) Plaintiff's claims were administratively denied both initially and upon reconsideration, prompting him to request a hearing before an Administrative Law Judge (ALJ). A hearing was held in November 2010 and an unfavorable decision was issued in December 2010. (Tr. at 8-21.) Plaintiff filed an appeal to this court. Judge Carlos Murguia reversed the ALJ's decision after determining that the ALJ erred in weighing the opinion of Dr. James Shafer. (Tr. at 820-24.) After remand, the ALJ again found that Plaintiff was not disabled and issued a decision on January 30, 2014. (Tr. at 611-630.) Plaintiff again appealed to this court. Judge John Lungstrum reversed and remanded the matter after determining that the ALJ failed to discuss Dr. Whitmer's opinions in the decision. (Tr. at 1575-82.) Upon remand, another hearing was held on December 28, 2017. (Tr. at 1467-1507.) A supplemental hearing was also held on September 26, 2018. (Tr. at 1508-35.) The ALJ issued a partially favorable decision on January 9, 2019. (Tr. at 1422-66.) Plaintiff exhausted his administrative remedies and has now appealed to this court.

At step one, the ALJ found Plaintiff had not been engaged in substantial gainful activity since the alleged onset date of October 23, 2006. (Tr. at 1429.) At step two, the ALJ found Plaintiff suffered from the following severe impairments: obesity; degeneration of the cervical and lumbar spines; degeneration of the bilateral knees; obstructive sleep apnea; major depressive disorder; posttraumatic stress disorder; intermittent explosive disorder; personality disorder; and alcohol and marijuana abuse. (Tr. at 1429.) At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or exceeded any impairment listed in the regulations. (Tr. at 1430-32.)

The ALJ next determined that Plaintiff has the RFC to perform sedentary work, as defined in the regulations, with some physical limitations.[2] With respect to Plaintiff's mental RFC, the ALJ determined that Plaintiff could occasionally interact with supervisors, but cannot tolerate close over-the shoulder supervision; may occasionally interact with colleagues if meetings are brief and task oriented, but may not interact with the public; can understand, remember, and execute intermediate instructions consistent with semi-skilled work; and can maintain concentration, persistence, and pace for simple instructions consistent with unskilled work. (Tr. at 1432.)

In determining Plaintiff's RFC, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, but Plaintiff's statements as to the intensity, persistence, and limiting effects of the symptoms were not fully supported based on the medical evidence discussed in the decision. (Tr. at 1433.) The ALJ extensively reviewed medical and other evidence pertaining to Plaintiff's symptoms.

---

[2] Because Plaintiff's arguments regarding alleged error focus on his mental functional abilities, this opinion does not fully discuss all medical opinions considered by the ALJ and Plaintiff's physical limitations as they are not relevant to the issues before the court.

Plaintiff has a limited history of mental treatment that occurred prior to the alleged onset date. In the first half of 2003, Plaintiff sought mental health treatment. Plaintiff again sought mental health treatment for a few months in 2005. As pointed out by the Commissioner, the records do reflect that upon intake, the examiner doubted the honesty of Plaintiff's report and raised the possibility of malingering. (Tr. at 1798-99.) In March 2003, the provider asked about auditory hallucinations that Plaintiff reported in the first session and Plaintiff denied reporting the hallucinations. Plaintiff then indicated that he may have multiple personality disorder although the provider noted that she had not seen any evidence of this disorder. (Tr. at 1811.) The ALJ determined that the records prior to 2005 received no weight because Plaintiff was able to work at that time. (Tr. at 1444.)

Although Plaintiff has alleged an onset date in 2006, Plaintiff does not have any mental health records from that time period. After 2005, the earliest note of mental health concerns occurred in February 2009. At that time, Plaintiff reported symptoms of depression to his primary care doctor, James Shafer, who prescribed antidepressant medication. (Tr. at 495.) In August 2009, Plaintiff sought mental health treatment at the Central Kansas Mental Health Center. Plaintiff was seen by Penny Swift Kelly, LSCSW. Kelly noted that Plaintiff had a depressed mood most of the day and that Plaintiff's statement of his problem was that "he's not happy with the disability process." (Tr. at 434.) Kelly recommended therapy and medication management. On September 18, 2009, Plaintiff met with Caryn Huslig, PA-C, for medication management. (Tr. at 440-41.) Ms. Huslig noted that Plaintiff reported having trouble with depression and was using marijuana to increase his motivation. Plaintiff stated that he did not feel like his medication was working. Ms. Huslig noted that she did not believe that he had been taking his medication regularly after inspecting the bottles and the dates on the bottles. Ms. Huslig noted that he was casually

5

dressed and groomed with good hygiene. Plaintiff's thought processes appeared to be logical but disorganized and scattered at times. Plaintiff's thought content was appropriate and his mood was depressed. (Tr. at 440.) Plaintiff's medications were adjusted.

On September 29, Plaintiff attended therapy and the therapist noted that Plaintiff was "much more calm today, compared to the intake appointment." (Tr. at 580.) On October 13, the therapist again noted that Plaintiff was "much more calm today with stable mood." (Tr. at 579.) On October 27, Plaintiff reported feeling much more balanced on his medications. Plaintiff continued to report difficulties sleeping and the therapist again noted that he was a little tired but "much more calm." (Tr. at 513.) On November 10, Plaintiff met with Ms. Huslig. She noted that Plaintiff's mood was appropriate, his thought process well organized, but his thought content was bizarre. Ms. Huslig increased his Abilify and added a new medication. (Tr. at 515.) One week later, Plaintiff informed his therapist that his mood and anger are much better managed with medication. (Tr. at 507.) His therapist "complimented him on his positive attitude and also acknowledged the medication helps stabilize his mood." (Tr. at 508.) On December 1, Plaintiff again attended therapy and was "rather calm" but upset with judges and lawyers due to the continued refusal for disability. (Tr. at 511.) Plaintiff reported that he could not work in his past environment due to "the lack of trust and failure to comply with the work policies and procedures." (Tr. at 511.) Plaintiff was unable to give a reason for not returning to vocational rehabilitation.

On December 30, Plaintiff met with Ms. Huslig and told her that the medication has been working for him. Plaintiff's mood was appropriate, his thought process was well organized, and his thought content was appropriate. Plaintiff was told to continue his medications. (Tr. at 514.) In January 2010, Plaintiff met with consultative psychologist Michael Schwartz, Ph.D. Dr. Schwartz noted that Plaintiff's chief complaint was his back injury and his right knee. Dr.

6

Schwartz noted that Plaintiff's thought process was sequential and understandable. Plaintiff's affect was neutral and Plaintiff stated that he was "mellow." (Tr. at 519.) Plaintiff reported that he slept a lot, approximately eleven hours in a day. Dr. Schwartz opined that Plaintiff did not have "any cognitive or emotional impairment which would prevent his working." (Tr. at 519.) On February 9, Plaintiff met with Ms. Huslig. Plaintiff reported that he was "doing pretty well" and that his medications were "working pretty well." (Tr. at 534.) Plaintiff's mood was appropriate, his thought process was well organized, and his thought content was appropriate. Ms. Huslig noted that there were no side effects for his medication.

On February 17, a mental impairment questionnaire ("opinion") was completed by Ms. Huslig. The questionnaire was addressed to Dr. George Jerkovich, a psychiatrist at Central Kansas Mental Health Center, and was also signed by Dr. Jerkovich. The opinion includes significant limitations. It states that Plaintiff is unable to meet competitive standards for the following: carry out very short and simple instructions; sustain an ordinary routine; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and respond appropriately to changes. It further states that Plaintiff has no useful ability to function in the following areas: maintain attention for a two hour segment; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; deal with normal work stress; and understand and remember detailed instructions. (Tr. at 429-30.) Additionally, it was noted that Plaintiff's medications result in the following side effects: dizziness, drowsiness, fatigue, lethargy, and upset stomach. (Tr. at 427.) The opinion states that Plaintiff's affect is "blunt, flat or inappropriate." (Tr. at 428.) Plaintiff also has "persistent disturbances of mood or affect." (Tr. at 428.)

7

Although the opinion was signed by Dr. Jerkovich, there is no indication in the record that Plaintiff has ever been seen by Dr. Jerkovich. Dr. Jerkovich also signed the treatment notes authored by Ms. Huslig on September 18, 2009, November 10, 2009, and February 9, 2010. The signature line said that the treatment note was "reviewed by: George S. Jerkovich, M.D." (Tr. at 515.) Again, there is no indication in the record that Dr. Jerkovich was present at any of those sessions with Ms. Huslig. The treatment notes reflect that Plaintiff was the only other person in attendance. (Tr. at 440, 515, 534.) There is no record of Plaintiff having any further sessions with Ms. Huslig after February 2010.

The ALJ discussed the opinion as follows:

> In February 2010, Caryn Huslig, PA, the physician's assistant who conducted the claimant's one prior medication evaluation, provided an opinion, which she signed (Exhibit B6F). Although she also put the name of her supervising physician, George Jerkovich, M.D., there is no indication he ever saw the claimant or affirmed her opinion (he did not co-sign the opinion). Therefore, this opinion is not from an acceptable medical source or a treating source.
>
> Ms. Huslig opines that the claimant has all side effects listed, although none were reported by the claimant in his treatment visits (Exhibit B6F, p.2). She also repeats the claimant's subjective complaints for her clinical findings, offering little insight into his actual condition (Exhibit B6F, p.2). Ms. Huslig also claims that the claimant has symptoms, including problems with vision, speech, or hearing, that are not indicated in any medical records (Exhibit B6F, p. 3). Then, Ms. Huslig opines that the claimant has no useful functional ability to function in a number of areas, including the ability to maintain attention for two hours; however, she merely repeats the claimant's allegations to support this claim. She also opines the claimant is seriously limited or unable to meet competitive standards in all functional areas where he is able to function. Nothing in the claimant's limited mental health records supports such extreme limitations, and Ms. Huslig only offers the claimant's unsupported allegations to support these claims. In addition to these serious limitations, Ms. Huslig then claims that he would decompensate with even minimal mental demands or changes. However, there is no basis provided for either this claim or the alleged two-year history of the claimant's condition. Overall, Ms. Huslig's opinion is supported by only the claimant's unsupported allegations, repeated during only a two-month treatment period, and not supported by prior records despite allegations of a long history of mental problems. As a result, this opinion received very little weight.

8

(Tr. at 1445.)

Next, the ALJ discussed that Plaintiff had limited mental health treatment after mid-2010. Plaintiff did have several consultative exams in order to assess his mental conditions. The ALJ noted that Plaintiff reported "depression" and "anxiety" to his medical providers during this time but had limited treatment from mental health professionals. Moreover, the ALJ noted that Plaintiff's reported symptoms, his abnormal findings, presentation and limitations would change over the course of the different examinations. The ALJ also noted concern that Plaintiff may be malingering. (Tr. at 1435-38, 1443.) The ALJ also found that Plaintiff's testimony at the hearing was contradictory in that he provided conflicting statements of what he could and could not do. (Tr. at 1434.) Therefore, the ALJ based his decision "heavily on the symptoms and limitations that are supported by evidence beyond the claimant's allegations." (Tr. at 1434.)

In March 2011, Plaintiff was evaluated by Scott Koeneman, Psy.D. Dr. Koeneman opined that Plaintiff was "capable of simple, repetitive unskilled work activities" although he may have problems maintaining appropriate social relationships. This opinion was given some weight. (Tr. at 1446.) A state agency psychiatrist, Robin Reed, M.D., reviewed the record and opined that Plaintiff could carry out simple and intermediate instructions and would do best working around a limited number of people. (Tr. at 723-24.)

Plaintiff was examined by Lynn Lieberman, Ph.D., in April 2012. Dr. Lieberman opined that Plaintiff had problems following instructions and poor concentration. The ALJ gave this opinion only some weight after noting that Plaintiff's prior exams and records suggested that he was able to perform at least simple instructions. (Tr. at 1446-47.)

In October 2012, Lauren Cohen, Ph.D., a state agency psychologist, reviewed the record and opined that Plaintiff could carry out simple and intermediate instructions and could work best

9

with work not involving the public or more than incidental contact with co-workers. The ALJ found that the opinion was consistent with the record and gave it significant weight. (Tr. at 1447.) In 2012, a state agency psychologist, Robert Blum, Ph.D., reviewed the record and included similar limitations as Dr. Cohen's opinion.

At step four, the ALJ found that Plaintiff was not able to perform past relevant work. (Tr. at 1450.) At step five, the ALJ found that given Plaintiff's age, education, work experience, and RFC, prior to December 15, 2018, there were jobs in the national economy in significant numbers that he could perform. (Tr. at 1450.) After December 15, 2018, Plaintiff's age category changed. This resulted in a finding by the ALJ at step five that he was disabled by application of the Medical-Vocational Guidelines due to consideration of Plaintiff's age, education, and work experience. (Tr. at 1451.)

**III. Analysis**

Plaintiff contends that the ALJ failed to properly evaluate his mental limitations due to his alleged error in weighing the opinion of Ms. Huslig and Dr. Jerkovich. An ALJ should "[g]enerally, ... give more weight to opinions from [claimant's] treating sources." 20 C.F.R. § 404.1527(c)(2). "[T]he opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Daniell v. Astrue*, 384 F. App'x 798, 804 (10th Cir. 2010) (quoting *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)). "When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). In evaluating a treating physician's opinion, the ALJ is to conduct a two-step process. At the first step, the ALJ must determine if the opinion is entitled to "controlling weight." *Krauser v. Astrue*, 638 F.3d 1324,

1330 (10th Cir. 2011). A treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2). At the second step, if the opinion is not entitled to controlling weight, the ALJ is to give good reasons for the weight given after applying certain factors. *Krauser*, 638 F.3d at 1330-31.

Plaintiff contends that the ALJ erred in failing to weigh the opinion of Ms. Huslig as an opinion of a treating source. Essentially, Plaintiff argues that Dr. Jerkovich and Ms. Huslig were acting as a treatment team and, therefore, the ALJ was required to complete the two-step process required for the weighing of a treating source's opinion. The Commissioner admits that the ALJ erred in failing to realize that Dr. Jerkovich signed the opinion but asserts that this error was harmless because Dr. Jerkovich was not a treating source and there is no evidence that Dr. Jerkovich and Ms. Huslig acted as a treatment team.

As an initial matter, the court agrees that the ALJ erred in failing to recognize that Dr. Jerkovich signed the opinion. There is a marking under the signature of Ms. Huslig on the signature page of the opinion. (Tr. at 432.) That signature appears above the printed name of Dr. Jerkovich although the signature is difficult to decipher. A somewhat similar signature appears on the treatment notes above the signature line for Dr. Jerkovich. (Tr. at 441.) Therefore, the ALJ erred in finding that Dr. Jerkovich did not co-sign the opinion. However, this error is harmless "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Meaning, had the ALJ identified the signature as Dr. Jerkovich, would a reasonable

administrative factfinder have determined that the opinion was one of a treating source, requiring the ALJ to conduct the two-step analysis.

Essentially, Plaintiff argues that had the ALJ correctly deciphered Dr. Jerkovich's signature, the ALJ was required to treat the opinion as one from a treating physician because Ms. Huslig and Dr. Jerkovich were acting as a treatment team. The court disagrees. First, the court notes that a physician assistant, such as Ms. Huslig, is not an acceptable medical source. SSR 06-03P, 2006 WL 2329939 at *1 (SSA Aug. 9, 2006). Only acceptable medical sources can provide medical opinions and be considered treating sources. *Id.*; *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007). Ms. Huslig's opinion must still be considered by the ALJ, which it was, applying the same factors under the regulation. SSR 06–03p, 2006 WL 2329939 at *4; 20 C.F.R. § 404.1527. With respect to Dr. Jerkovich, he would be an acceptable medical source under the regulations. In order to be considered a treating source, however, there must be evidence in the record that Dr. Jerkovich has actually seen Plaintiff for treatment. 20 C.F.R. § 404.1527(a)(2). There is no such evidence. Although Plaintiff argues that Dr. Jerkovich is part of the treatment team with Ms. Huslig, Plaintiff offers no evidence from the record that Dr. Jerkovich ever saw Plaintiff. Rather, Plaintiff states that "the ALJ believed that Dr. Jerkovich had never seen Martin nor did he co-sign the opinion….The ALJ is wrong. Not only did Dr. Jerkovich sign the form, but Ms. Huslig and Dr. Jerkovich represent a treatment team, and the opinion should have been considered as one from a treating source." (Doc. 13 at 18.) At no point, however, does Plaintiff cite to the record for support that Dr. Jerkovich saw Plaintiff nor does Plaintiff make a specific assertion that Dr. Jerkovich saw Plaintiff. Therefore, under the regulations, Dr. Jerkovich is not a treating source.

Although Dr. Jerkovich never saw Plaintiff, Plaintiff argues that the opinion should be considered one of a treating source because Dr. Jerkovich and Ms. Huslig were a treatment team. Instead of citing to regulations in support of this alleged error, Plaintiff cites to authority from this district. While the court notes that a treatment team approach has been recognized in other cases, the facts of this case do not support such a finding.

Plaintiff cites to *Kingsbury v. Astrue*, No. 08-4014-JAR, 2008 WL 4826139, at *10 (D. Kan. Nov. 5, 2008), and *Ceballos v. Astrue*, No. 08-4108-JAR, 2009 WL 2475472, at *7-8 (D. Kan. Aug. 12, 2009). In *Kingsbury*, the physician "stated that ARNP Noll works under his supervision and that he had approved all treatment provided to the patient and concurred with the opinions of ARNP Noll (R. at 858)." *Kingsbury*, 2008 WL 4826139, at *10 (citing to the administrative record). No such statement by Dr. Jerkovich appears in the record here. In *Ceballos*, the court declined to find that the opinion was that of a treating source because

> [t]he only record evidence of any connection whatsoever between Dr. Lear and NP Friesen is that they both signed the medical source statements presented to the ALJ. As in *Nichols*, the record does not indicate Dr. Lear had ever treated plaintiff or made any actual evaluation of claimant's condition other than a mere signature on certain reports. Similar to the facts in *Metivier*, although Dr. Lear is presumably NP Friesen's supervising physician, there is no record evidence establishing that fact, and there is no evidence of a close working relationship or active supervision between Dr. Lear and NP Friesen.

*Ceballos*, 2009 WL 2475472, at *9.

Plaintiff argues that *Ceballos* is distinguishable because "the nature of the relationship between Dr. Jerkovich and Ms. Huslig is clear." (Doc. 17 at 2.) Plaintiff, however, fails to explain how the relationship between Dr. Jerkovich and Ms. Huslig is "clear." Plaintiff merely cites to the pages in the record where Dr. Jerkovich's signature appears. As in *Ceballos*, the fact that there is a signature on reports does not establish that there was a treatment team that actually collaborated on Plaintiff's treatment. There is no evidence that Dr. Jerkovich did anything but sign off after

13

looking at the opinion and the limited treatment notes. Therefore, the ALJ did not err by finding that the opinion was not from a treating source because there is no evidence of a treatment team approach to Plaintiff's mental health treatment by Ms. Huslig. *Ceballos*, 2009 WL 2475472, at *9; *see also Nichols v. Comm'r of Soc. Sec.*, 260 F. Supp.2d 1057, 1065 (D. Kan. 2003); *Metivier v. Barnhart*, 282 F. Supp.2d 1220, 1226–1227 (D. Kan. 2003).

As discussed, the ALJ must still consider the opinion. The court finds that the ALJ thoroughly discussed the opinion and gave sufficient reasons for discounting that opinion. In this case, the ALJ stated that the opinion was not supported by the treatment records, was inconsistent with evidence in the record, and was based on Plaintiff's subjective complaints. (Tr. at 1445.) A finding that an opinion is unsupported by the evidence or is inconsistent with the record constitutes good cause for assigning the opinion partial weight. *See Arterberry v. Berryhill*, 743 F. App'x 227, 229 (10th Cir. 2018); *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987); 20 C.F.R. § 404.1527(c)(3), (4). The ALJ noted that the opinion states that Plaintiff has several side effects due to his medication. However, Ms. Huslig's treatment notes do not show that Plaintiff complained of side effects. The ALJ also noted that Ms. Huslig has opined that Plaintiff has severe limitations in a number of areas but that the record does not support such extreme limitations. The ALJ also stated that Ms. Huslig did not provide a basis for several of the limitations in the opinion. This is an appropriate basis to discount Ms. Huslig's opinion. *Terwilliger v. Comm'r, Soc. Sec. Admin.*, No. 19-1028, 2020 WL 290421, at *5 (10th Cir. Jan. 21, 2020) (citing 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (explaining that the more support and explanation provided for an opinion, the more weight the agency will give it).

While Plaintiff has identified evidence in the record which may lend support to Ms. Huslig's opinion, this court is not to reweigh the evidence. *Bowman v. Astrue*, 511 F.3d 1270,

1272 (10th Cir. 2008). This court is to review the sufficiency of the evidence and cannot "displace the agency's choice between two fairly conflicting views." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). The court finds that the ALJ properly weighed Ms. Huslig's opinion and sufficiently explained his reasons for assigning the opinion very little weight.

Although the ALJ did not recognize that Dr. Jerkovich signed Ms. Huslig's opinion, that incorrect finding is harmless error. Dr. Jerkovich and Ms. Huslig were not a treatment team and therefore the opinion was not from a treating source. Moreover, the ALJ did thoroughly discuss Ms. Huslig's opinion. Although the ALJ did not weigh the opinion as one of Dr. Jerkovich, this error was harmless because he did properly weigh the opinion. *See Lately v. Colvin*, 560 F. App'x 751, 754 (10th Cir. 2014) (failure to weigh an opinion of a medical source is not error when a nearly identical opinion is weighed by the ALJ).

This court must affirm an ALJ's decision if substantial evidence supports that decision. *See Tarpley v. Colvin*, 601 F. App'x. 641, 643 (10th Cir. 2015). Substantial evidence is "more than a scintilla, but less than a preponderance." *Id.* That much exists in this case.

### IV. Conclusion

The Commissioner's decision is AFFIRMED.

The clerk is directed to enter judgment in accordance with this order.

IT IS SO ORDERED this 30th day of January, 2020.

                                                           _____s/ John W. Broomes_____
                                                           JOHN W. BROOMES
                                                           UNITED STATES DISTRICT JUDGE